J. M. KELLER, Appellant, v. HERMAN J. MEYER et al.,
Respondents.

St. Louis Court of Appeals, March 29, 1898.

1. **Instructions:** CONTRACT OF SALE: AGENT: BROKER: MEASURE OF
DAMAGES.   Appellants were wholesale grocers in Monroe, Louisiana.
Respondents were millers and manufacturers of flour at St. Louis,
Missouri, and had a broker, R. L. Evans, at Monroe, Louisiana, who
on the fifteenth of May, 1895, sold appellants six hundred barrels of
flour for account of respondents, to be delivered at the city of Mon-
roe, and executed a written contract of sale quoting flour as follows:
"500 bbls. Pride $2.70, 100 bbls. Swan $2.90.   Terms, 30 days net."
This sale was immediately telegraphed respondents, who on the
same day wired Evans, broker, that they could not accept his orders
except at market price, said price being much higher than amount
specified in written contract of sale.   Respondents refused to deliver,
and appellants brought suit for breach of contract.   The answer set
up that Evans had no authority to make sale as he made it, and that
under a custom all such sales were subject to the approval of re-
spondents; also a conspiracy between Evans and the appellants to
defraud respondents in sale of flour.   Held, that the following instruc-
tions properly declared the law, and should have been given:   The
court sitting as a jury declares the law to be, that if it finds from the
evidence that one R. L. Evans was the broker or agent of defendants
at the city of Monroe, in the state of Louisiana, during the month of
May, 1895, and as such sold to plaintiff on or about the fifteenth day
of May, 1895, five hundred barrels of flour known as "Pride" for the
sum of $2.70 per barrel, and one hundred barrels of flour known as
"Swan" for the sum and price of $2.90 per barrel, to be delivered at
the said city of Monroe, and to be paid for thirty days thereafter;
and at the time of said sale said Evans had in his possession a tele-
gram from defendants, quoting him the prices at which said flour
should be sold, and said prices were $2.70 per barrel for "Pride,"

and $2.90 per barrel for "Swan," delivered at said city of Monroe, and that upon the faith of said telegram plaintiff purchased said flour. And if it further finds that defendants refused to deliver said flour to plaintiff for such price and upon such terms, and so notified plaintiff, then it will find for plaintiff and assess its damages at such sum, not to exceed the amount claimed in plaintiff's petition, as it may find from the evidence is the difference between the price at which said flour was sold and the price at which the same quantity and kind of flour could have been purchased for in said city of Monroe, at the time plaintiff received notice from defendants that they would not deliver said flour; notwithstanding the court may further find that said telegram was a mistake made by defendants, which they afterward corrected, unless it finds that such correction was known to plaintiff at the time of sale.

2. ———: USAGE: CONTRACT. An instruction which declares the law under the above state of facts, to be that the said contract is complete in itself, and that any usage which may exist in the trade of buying and selling flour, at the place where the same was bought and sold, can not change or alter, or contradict said contract, properly declares the law.

3. Conspiracy to Defraud: EVIDENCE. Under the plea of conspiracy it is competent to prove any fraud on the part of those engaged directly in the transaction that would avoid the contract.

4. Written Contract: USAGE OF TRADE. Where a contract is in writing, definite, and certain in all of its parts, evidence of usage is inadmissible to contradict or vary its terms.

*Appeal from the St. Louis City Circuit Court.*—HON. HORATIO D. WOOD, Judge.

REVERSED AND REMANDED.

F. J. McMASTER for appellant.

A broker or agent having actual or apparent authority to make contracts with third parties, who makes one in writing which shows that the subject matter is certain and there is no doubt as to the import of the terms employed, evidence of usage is not admissible. In the case of Kimball v. Brawner, 47 Mo. at page 400, the court says: "Where the subject matter is certain and there is no doubt as to the import

of the terms employed, evidence of usage is not admissible in respect to what the contract expressly declares. Evidence of usage comes in to show the intention of the parties in all those particulars which are not expressed in the contract, or which are expressed in unusual or technical terms. Citing many authorities. The case of Wolff v. Campbell, 110 Mo. 119, 120, is to the same effect. The supreme court of Massachusetts, in the case of Byrnes v. Massasoit Packing Co., 137 Mass. 313, lays down the correct doctrine as to the admissibility of evidence of usage, as was shown by the evidence in this case. It says: "In an action for a breach of a written contract made by agent of defendant in another state for the sale of goods to the plaintiff, evidence of a custom among dealers of such goods in this commonwealth to accept or reject contracts made by their selling agents, is inadmissible, in the absence of evidence that such a custom was known in the place where the contract was made, or that any notice of it was given to plaintiff." There is no claim in this case that plaintiff had actual knowledge of the alleged usage which defendants set up. And the only theory upon which it could be applied, if a usage had been shown at all, is presumptive knowledge. Before you can charge presumptive knowledge it must be shown, first, that the usage existed and that it was so universal and notorious that it was presumed that all were conversant with it. This is the doctrine laid down by the supreme court of Missouri in the case of Walsh v. Miss. T. Co., 52 Mo. 438. In Park v. Viernow, 16 Mo. App. 383, the court said: "It must be shown to be so general and well established that the parties must be presumed to have had knowledge of it and to have contracted with reference to it." This is the rule of law that has been unalterably adhered to in this state. See Martin v. Milling Co., 49 Mo. App. 31; Martin v. Hall, 26 Mo.

386; Freight Co. v. Standard, 44 Mo. 82; Hyde v. News Co., 32 Mo. App. 298.

MERRIFIELD W. HUFF for respondents.

When an instruction is on the whole case and asks for a verdict it must present every theory of the case, if there is any evidence to support such theory. Hohstedt v. Daggs, 50 Mo. App. 240; Wood Machine Co. v. Bobbst, 50 Mo. App. 427.; Griffith v. Conway, 45 Mo. App. 574; Maack v. Schneider, 57 Mo. App. 431. In this case Evans was a commercial broker and as such differed from a traveling salesman or commercial traveler. Portland v. O'Neil, 1 Ore. 218; Hamburger v. Marcus, 167 Pa. St. 133; Harby v. Hot Springs, 11 S. W. Rep. 694; Stratford v. Montgomery, 110 Ala. 619. If the custom or usage of the flour trade in St. Louis was that such trade became binding only on the acceptance of the order, then this signed note never became binding on the respondents, and no contract was ever consummated. Mabry v. Kelly, Etc., Shoe Co., 1 Mo. App. 3; 4 Am. and Eng. Ency. of Law [2 Ed.], 962; Cropper v. Cook, L. R. 3 C. P. 194; Sumner v. Stewart, 29 Pa. St. 321; Taliaferro v. Bank, 71 Md. 200. In the absence of express authority Evans had only right to bind his principal by selling at the market price. If the alleged express authority was in fact an error, and this error was sufficiently apparent to put the appellant on inquiry, then the alleged purchaser will not be protected in the absence of such inquiry. Meachem on Agency 1889, secs. 289, 362.

BLAND, P. J.—In May, 1895, appellants were a limited corporation under the laws of the state of Louisiana, carrying on a wholesale grocery business at the city of Monroe in said state.

VOL. 74 app—21

Respondents were millers and manufacturers of flour with their chief office in the city of St. Louis, Missouri; they (the respondents) had at the city of Monroe a broker, one R. L. Evans, who on the fifteenth of May sold to the appellants six hundred barrels of flour for account of respondents, to be delivered at the city of Monroe, and executed to them the following contract of sale:

STATEMENT.

"May 15th 1895.

"Sold to J. M. Keller Co. (limited) for account Meyer & Bulte, the following flour, delivered at Monroe, La.

500 bbls. Pride ......... ..... .... ........... .......... .....$2 70
100  "  Swan........................... .. ..................... 2 90

"Terms 30 days, net.          R. L. Evans."

This sale was immediately telegraphed respondents, who on the same day (May 15) wired Evans that they could not accept his orders except at market prices. Respondents refused to deliver the flour, and appellants brought this suit for a breach of the contract, alleging substantial damages. The answer set up as a defense that the broker Evans had no authority to make the sale (as he made it), and that under a custom all such sales were subject to the approval of respondents and were not binding, until approved by them; also a conspiracy between Evans and the appellants to cheat and defraud respondents in the sale of the flour. The issues were submitted to the court without the intervention of a jury. The facts briefly stated are about as follows: At 12:04 P. M., May 14, 1895, the respondents sent the following telegram to Evans: "R. L. Evans, Monroe, La. Swan 290—Pride 270 delivered. Quote Millsaps Cash. Meyer & Bulte."

At 2 P. M. same day Meyer & Bulte telegraphed "R. L. Evans, Monroe, La., Swan Alley; Pelican Alloy; Pride, alive previous message an error." The uncon-

tradicted testimony was that the telegram to Evans quoting Swan at $2.90 and Pride at $2.70, was an error, and that the second telegram was sent correcting the error as soon as it was discovered, and that the market value of the Swan at Monroe, Louisiana, on that date was $3.90, and of Pride at $3.70. J. M. Keller, president of the appellant company, testified in substance that on May 15, 1895, Evans came to the office of the company and offered to sell him flour—Pride at $2.70, and Swan at $2.90 per barrel delivered at Monroe on thirty days time to an unlimited number of barrels. Keller states that when these prices were made to him he knew they were considerably below the market value of the flour and he asked Evans if there was not some mistake, as the prices which he had offered were considerably lower than what the company had been able to obtain from other houses; that Evans showed him the telegram from Meyer & Bulte quoting prices as offered by Evans, and remarked that he supposed Meyer & Bulte knew what they were doing; that a short time previous they had quoted flour delivered at Monroe at least fifty cents per barrel under other houses, and that he had made the sale and the goods had been shipped, and that he (Keller) need not give himself any uneasiness about getting the flour; that he was their duly authorized representative, and that they would adhere to any contract he might make; that he then bought four hundred barrels and Evans went off, but come back and insisted that the order should be increased to six hundred barrels, which was done; that the transaction was between 1 and 2 o'clock in the afternoon; that his company had not previous to this purchased any flour of Meyer & Bulte; the second visit of Evans was about 2 or 3 o'clock in the afternoon; that on the next day (Thursday) he heard that the telegram of Meyer & Bulte was a mistake, but did not

see Evans until after the company had received a letter about the sale from Meyer & Bulte; that the order for six hundred barrels was an unusually large order for the company to make; that his company made some sales of the flour ordered from Meyer & Bulte on the basis of the purchase from Evans, which were filled by the company at a loss. The following correspondence between appellants and respondents were read in evidence:

"MEYER & BULTE, MERCHANT MILLERS.

"ST. LOUIS, May 17th 1897.

"*J. M. Keller Co., Monroe, La.*

"GENTLEMEN:—We are in receipt of letter from Mr. R. L. Evans ordering flour for you at prices not duly authorized. We regret to notify you that we can not recognize these instructions as *bona fide* orders, and have this day returned same to Mr. Evans, who will perhaps make a further explanation to you. We are,

"Yours truly,

"MEYER & BULTE, per Bulte."

"J. M. KELLER CO., LTD.

"MONROE, LA., 5-21, 1895.

"*Messrs. Meyer & Bulte, Saint Louis.*

"GENTLEMEN:—We are in receipt of your favor of the 17th inst. and note its contents. In reply will say: we can prove that Mr. Evans is your agent and that you so introduced him to the trade here, stating further that any prices made by him would be filled by you; further he had your telegram in which you made the prices. If this was a mistake it was not our fault, and we should not be made to suffer for your errors, as we have sold part of this flour, depending on you to fill our order. We did not buy waiting to hear from you. We are entirely out of flour. We wish to state that we want only what is right in the matter and are deter-

mined to have that, let cost be what it may. We think it would only be just and right that you should meet us half way in adjusting this matter. We therefore await a proposition from you, based on your ideas as to what is fair in your estimation. Awaiting your early reply, we are,

"Truly yours,

"J. M. KELLER Co. (LIM.)

"Per J. M. K., Pt."

"MEYER & BULTE, MERCHANT MILLERS.

ST. LOUIS, May 23rd, 1895.

"*J. M. Keller & Co., Monroe, La.*

"GENTLEMEN:—We have your letter of the 21st and carefully note contents. In reply. wish to state that Mr. Evans is our broker, but we are not liable for any errors on his part. It is true we wired him prices which ranged a dollar per barrel less than was intended. This was purely an error and was discovered immediately, and was corrected by wire within an hour after the first message was sent. This mistake must have been evident to anyone dealing in flour. It would seem strange, and we think it would be difficult for any flour man to prove that he knew so little about the value of goods as not to be able to judge its price within a dollar per barrel, and it seems more strange to us that any reputable house should try to take advantage of such a matter. The correction was made so promptly that the error could not have damaged anyone who was acting in good faith. We regret that this has occurred, but our case is a clear one, and our conscience is not worrying us in the least. We, therefore, have no proposition to make. We hope, upon reconsidering the circumstances, you will accept our explanation as satisfactory. We are, yours truly,

"MEYER & BULTE, per Bulte."

Keller also testified that he knew that Meyer & Bulte previous to May 15, 1895, had made sales of flour at Monroe under marked quotation, and that his knowledge of this fact with the assurance from Evans that the flour would be shipped, and having seen the telegram, dispelled any doubt he might have had to the contrary. On May 14 Evans sent Meyer & Bulte, in answer to telegram correcting error on their part of that date to him, the following: "May 14, '95. To Meyer & Bulte: Last message too late. Sold 2500 barrels first quotation. R. L. Evans," which was immediately answered by the following: "May 15, 1895. R. L. Evans, Monroe, La.: Telegram received. Can not accept your orders except at market price. Meyer & Bulte."

Respondent Meyer testified that R. L. Evans was the broker of Meyer & Bulte at Monroe, Louisiana, and represented them there. Slight evidence, over the objection of appellants, was offered tending very slightly to prove that there was a custom at Monroe, Louisiana, among merchants, that flour merchants in St. Louis reserved the right to reject all orders taken for flour by agents or brokers, and that no sale was completed until approved by the St. Louis merchant for whom the sale was made. Appellants asked the following declarations of law which were refused:

"The court sitting as a jury declares the law to be, that if it finds from the evidence that one R. L. Evans was the broker or agent of defendants at the city of Monroe in the state of Louisiana, during the month of May, 1895, and as such sold to plaintiff on or about the 15th day of May, 1895, 500 barrels of flour known as 'Pride' for the sum and price of $2.70 per barrel, and 100 barrels of flour known as 'Swan' for the sum and price of $2.90 per barrel, to be

INSTRUCTION: damages.

delivered at the said city of Monroe, and to be paid for thirty days thereafter; and at the time of said sale said Evans had in his possession a telegram from defendants, quoting him the prices at which said flour should be sold, and said prices were $2.70 per barrel for 'Pride' and $2.90 per barrel for 'Swan' delivered at said city of Monroe, and that upon the faith of said telegram plaintiff purchased said flour. And if it further finds that defendants refused to deliver said flour to plaintiff for such price and upon such terms, and so notified plaintiff, then it will find for plaintiff and assess its damages at such sum, not to exceed the amount claimed in plaintiff's petition, as it may find from the evidence is the difference between the price at which said flour was sold and the price at which the same quantity and kind of flour could have been purchased for in said city of Monroe, at the time plaintiff received notice from defendants that they would not deliver said flour; notwithstanding the court may further find that said telegram was a mistake made by defendants, which they afterward corrected, unless it finds that such correction was known to plaintiff at the time of said sale."

"If the court sitting as a jury finds from the evidence that the contract of sale mentioned in plaintiff's petition was entered into between plaintiff and defendants' broker and that plaintiff was induced to believe, by a telegram sent said broker by defendants just before or at the time of making said contract that defendant would sell the flour mentioned for the price and upon the terms named therein, and upon the faith of such belief entered into said contract of sale, then the court declares the law to be that said contract is complete in itself and that any usage which may exist in the trade of buying and selling flour, or the place

where the same was bought and sold, can not change, contradict or alter said contract.''

The court on plaintiff's motion gave the following instructions:

''The court sitting as a jury declares the law to be that before defendants can invoke a usage in this case they must show by evidence that the usage proposed to be invoked is one that is certain and uniform; that it is general, by which it is meant that the method of dealing is the universal and notorious method of those engaged in the buying and selling of flour in the city of Monroe, Louisiana; that plaintiff had knowledge of the particular usage, and that it and 'defendants, through their broker, made the contract in question with reference thereto, and intended that it should enter into said contract. If, therefore, the court finds from the evidence that the alleged usage was not certain and uniform, or was not general, or that plaintiff had no knowledge of it, or that plaintiff and defendants, through their broker, did not make such contract with reference to it, or intend that it should enter into said contract, then the court will find that the alleged usage can not be invoked by defendants against plaintiff in this case.''.

''The court sitting as a jury declares the law to be that knowledge of a usage may be either actual or presumptive. That before a party can be charged with presumptive knowledge, it must be shown, by satisfactory evidence, *first*, that the alleged usage existed; and *second*, that it was so universal and notorious, by which is meant that it was so generally known and established and so well settled and so uniformly acted upon, as to raise a fair presumption that it was known to both contracting parties, and they contracted with reference to it and in conformity with it.''

To the ruling of the court in refusing appellant's instructions it saved an exception. The court found the issues for the defendants and rendered judgment in their favor. After an unsuccessful motion for a new trial, plaintiffs filed bill of exceptions and took an appeal to this court.

Appellants contend that the court erred in refusing its instructions. To this contention respondents reply, that the first instruction ignored the *bona fides* of the purchase of the flour by appellants. If the pleadings and evidence are sufficient to raise this element of defense, then respondents' position is correct, for the instruction undertakes to cover the entire case, and not appellants side of it only. The answer charges a conspiracy between Keller (representing the appellants and Evans, the respondents' broker, to cheat and defraud the respondents. It is not contended that an actual conspiracy was proven, and that defense is by the evidence eliminated from our consideration; but it is contended that there is evidence that Evans acted fraudulently and with the intent to cheat and wrong respondents, and that there are circumstances in the case which tend to prove that Keller did not act in good faith. That Evans purposely undertook to cheat and wrong the respondents is conceded, but it is denied that Keller acted in bad faith; on the contrary it is insisted that he acted as a prudent and cautious man in his dealings with Evans. Under a plea of conspiracy we think it is competent to prove any fraud on the part of those engaged directly in the transaction that would avoid the contract. The evidence in the case to our minds indicates that Keller acted in the utmost good faith and with commendable prudence and caution. The offer of Evans to sell him flour at prices considerably below the market value excited his suspicions and led him to make inquiry, the informa-

tion he got on inquiry was a genuine telegram from respondents, dated the day previous, instructing Evans to sell the flour at the figures he had given to Keller; what more should Keller have done? He knew that Evans was the agent of respondents for the sale of their flour at Monroe; he knew that Evans had a short time previous to this, taken orders for respondents' flour at prices considerably below the market value and that these orders had been filled. Why should he hesitate under the circumstances to accept the profitable offer? Here was the authorized agent of the respondents, with express written authority (the telegram) offering the flour at prices below the market value. The appellant was a dealer in flour for profit; what stood in its way to an acceptance of the offer, not prudence, nor a want of faith in the *bona fides* of the offer? To have refused the offer would have shown a want of ordinary business sagacity, and been an evidence of stupidity. In our view the evidence failed utterly to prove bad faith on the part of Keller, and instruction number 1 should have been given. The second instruction in any view of the evidence should have been given. If the appellants were shown the telegram from Meyer & Bulte authorizing Evans, their broker, to sell the flour at prices quoted by the telegram, and the purchase was made on the faith of this telegram, as testified to by Keller, then in effect the transaction was an offer direct from Meyer & Bulte to sell flour to the appellant at the prices named, and the giving of the order to Evans was an acceptance of the offer for the quantity of flour specified in the bill of the sale or sale note. The con-

CONTRACT in writing: evidence of usage. tract was in writing, definite and certain in all of its parts, and evidence of usage was inadmissible to contradict or vary its terms. Kimball v. Brawner, 47 Mo. 399; Wolff v. Campbell, 110 Mo. 114. The evidence of custom should not have been

admitted, and while the declarations of law in regard to custom given by the court of its own motion are correct as abstract propositions of law, they had no place in this case. For the errors herein noted, the judgment is reversed and the cause remanded. Judge BOND concurs; Judge BIGGS dissents.